**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LARNELL EARL HENDRICK,<br><br>Plaintiff,<br><br>v.<br><br>LIEUTENANT NJOKU ET AL.,<br><br>Defendants. | Civil Action No.: BAH-25-1369 |

**MEMORANDUM OPINION**

Self-represented Plaintiff Larnell Earl Hendrick, who is currently incarcerated at Jessup Correctional Institution ("JCI") in Jessup, Maryland, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide him adequate medical care. ECF 1. Currently pending are Defendant Muleta Obsu, M.D.'s motion to dismiss or, in the alternative, motion for summary judgment (ECF 41); Defendants Lieutenant Chukwuma Njoku, Correctional Officer ("CO") Mariam Balogun, CO Santana Barnett, and Warden Damean Stewart's[1] (the "State Defendants") motion to dismiss or, in the alternative, motion for summary judgment (ECF 48) and motion to strike (ECF 78); Defendant Gilbert Washington's motion to dismiss or, in the alternative, motion for summary judgment (ECF 72). Also pending are Hendrick's motion to supplement complaint (ECF 31), motion to clarify the record (ECF 37), motion for service of complaint to Medical Defendant (ECF 50), motion to appoint counsel (ECF 53), motion to file surreply in opposition to State Defendants' reply (ECF 75), motion to file supplemental pleadings in opposition to Defendant Obsu's motion (ECF 79), motion for judicial notice of adjudicative facts

[1] The Clerk will be directed to amend the docket to reflect the State Defendants' full names.

in case (ECF 80), motion for leave to file a supplemental pleading to add new defendant (ECF 84), and motion for clarification (ECF 88).

All of the dispositive motions are fully briefed and ripe for review. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the reasons stated below, Defendant Washington's motion will be granted; Defendant Obsu and the State Defendants' motions will be granted in part and denied in part. The non-dispositive motions will be resolved as set forth below.

## I. NON-DISPOSITIVE MOTIONS

### A. Motion to Supplement Complaint and for Clarification and Motion to Clarify Record

Hendrick seeks to add additional facts in support for the claims raised in his complaint. ECF 31. None of the Defendants have opposed the motion, and they have responded to the supplemental pleading in their respective dispositive motions. Therefore, the Court will grant Hendrick's motion. His motion to clarify seeks to reassure the Court that the motion to supplement was not an assumption that he could file the supplement but a request. ECF 37. The motion was docketed correctly, so the Court will grant the motion to clarify to that extent.

### B. Motion for Service of Complaint to Medical Defendant

In this motion, Hendrick requests that service be attempted again on Defendant Mezu, who he has now identified as Dr. Kelechi Mezu, a Centurion employee. ECF 50. Counsel for Dr. Obsu, also a Centurion employee, notes that a Dr. Mezu could not be found in their records. ECF 41, at 1. They contend that if Mezu was later identified, their arguments would likely apply to Mezu as well. However, it appears that Hendrick was able to identify Dr. Mezu through review of the records submitted by Centurion in response to his motion for preliminary injunction. ECF 50, at 2; *see* ECF 25-1, at 23 (Special Needs/Urgent Order dated February 14, 2025, submitted by Kelechi R. Mezu, OD). Centurion's counsel will be granted 14 days in which to notify the Court whether

they can accept service on Mezu's behalf. The Court suggests counsel take greater care in reviewing their own exhibits in the future.

**C. Motion to File Surreply and Motion to Strike**

On March 4, 2026, Hendrick filed a motion seeking to file a surreply to the State Defendants' dispositive motion. ECF 75. He asserts that the State Defendants misstated and mischaracterized his claims. *Id.* at 2. The State Defendants filed an opposition on March 17, 2026, which was mislabeled as a motion to strike on the docket. ECF 78. The Court will direct the Clerk to amend the docket to reflect that the filing is an opposition.

Unless otherwise ordered, a surreply is not permitted. *See* Local Rule 105.2(a) (D. Md. 2025). A surreply is permitted when the moving party would be unable to contest any matters raised by the opposing party in their reply for the first time. *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D. D.C. 2001). State Defendants claim that the arguments in their reply (ECF 70) are consistent with those in their motion, and they do not include additional facts or exhibits in the reply. ECF 78, at 2. Upon review of the reply and Hendrick's proposed surreply, the Court will deny Hendrick's request. There are no new arguments or evidence raised in the reply, and the proposed surreply is merely a restatement of his points that Hendrick did or could have made in his opposition.

**D. Motion to File Supplemental Pleading and Motion for Judicial Notice**

In this motion, Hendrick seeks to supplement his response to Dr. Obsu's dispositive motion. ECFs 79 and 82. Obsu opposes the motion. ECF 83. Obsu filed his dispositive motion on December 17, 2025. ECF 41. Hendrick filed his opposition on December 31, 2025. ECF 54. He then filed two supplements to his opposition on January 5 and 14, 2026. ECF 55, 59. Rather than seeking to supplement his opposition, Hendrick's motion appears to be an attempt to amend

the complaint to add new facts against various individuals who are not party to this case. ECF 79; ECF 82. While the allegations in his motions also concern his receipt of medication, the claims appear to be against a separate set of individuals for events that took place after the filing of Obsu's and the State Defendants' dispositive motions. At this late juncture, the Court will not permit Hendrick to widen the nature of this suit to such an extent. Accordingly, his motion, construed as a motion to supplement the complaint, will be denied.

Accompanying his motion to supplement the complaint is Hendrick's motion for judicial notice of adjudicative facts in case. ECF 80. He asks the Court to take judicial notice pursuant to Fed. R. Evid. 201(a) of discrepancies in defendants' various filings in this case. The motion will be denied as the Court has access to the full record and judicial notice is inappropriate.

**E. Motion for Leave to File a Supplemental Pleading to Add a New Defendant**

On April 17, 2026, Hendrick once again moved for leave to supplement his complaint with an additional defendant.[2] ECF 84. He seeks to add Centurion Health "and any person(s) employed by Centurion Health who had direct contact, responsibility thereto, participation thereto, participation in assessment of [Hendrick's] receiving his acetazolamide medication . . ." between May 1, 2025, and February 11, 2026. *Id.* at 2–3, *see generally* ECF 84-1. Obsu opposes the motion, and Hendrick replied. ECFs 87 and 89. Upon review of the proposed supplement, Hendrick does not set forth any specific facts against these employees nor identify any of them by name. Hendrick otherwise seeks to bring a municipal liability claim against Centurion without providing any factual basis. The conclusory allegations are insufficient to show that Hendrick is

[2] Hendrick also filed a motion for clarification seeking to add additional context to his request for leave to supplement. ECF 88. The motion is essentially a supplement to the motion for leave. It will be granted to the extent it was considered in the Court's review of the motion for leave.

entitled to supplement his complaint pursuant to Fed. R. Civ. P. 15(a) because it would be futile to allow him to do so. The motion will be denied.

## II. BACKGROUND

### A. Complaint and Supplement Allegations

Hendrick alleges in his verified complaint that Defendants Njoku, Balogun, Barnett, Washington, Obsu, and Mezu conspired to and did retaliate against him in violation of the First Amendment for filing grievances and filing a separate federal lawsuit in this court, *Hendrick v. Dean*, Civ. No. BAH-24-1214 (D. Md. filed Apr. 24, 2024), against fellow JCI officers, and in doing so were also deliberately indifferent in violation of the Eighth Amendment. ECF 1-1, at 1 ¶ 2, at 16–17 ¶ 24, at 18 ¶ 26, at 22–23 ¶ 32; ECF 31, at 5. He claims the retaliation was ordered by Njoku at the direction of the officers involved in the prior lawsuit. ECF 31, at 3, 6. According to Hendrick, Njoku and Balogun are "troubled officers" with a known history of reprisals against inmates. *Id.* at 10–11. Between approximately August 22 and December of 2024, Defendants Njoku, Balogun, and Barnett stole Hendrick's mail, transcripts, medical records, and family photographs. ECF 1-1, at 2 ¶ 3. On September 2, 2024, Balogun told inmates on Hendrick's tier to beat him up and Njoku told officers and inmates "we're going to get Hendrick for filing those lawsuits." *Id.* ¶ 4; ECF 31, at 4–5. Hendrick will not name the solicited inmates for fear of his safety. ECF 31, at 5. In the following weeks, Hendrick heard Barnett admit that he had opened Hendrick's cell door at Njoku's direction and express that it was "a thrill" to harass Hendrick. ECF 1-1, at 3 ¶ 6; ECF 31, at 10. Additionally, on more than one occasion in November 2024, Njoku told Hendrick to "go ahead and name some of the inmates who me and Balogun have directed to beat you up, we don't care, all of our officers already know that we've directed them, that we're doing this to you." ECF 31, at 4. Njoku taunted Hendrick, implying that even if he

reported their actions to higher ranked officers, nothing would happen to him but Hendrick would be "crushed." *Id.* On January 22, 2025, Hendrick states that Balogun arrived in medical for his chronic care appointment and apologized to him for opening the cell so that his items could be stolen. ECF 1-1, at 2–3 ¶ 5. Hendrick states that sometimes the thefts occurred at night and he would wake up to his property in disarray or missing, which caused him to be so frightened that he often wakes up involuntarily throughout the night. *Id.* at 3–4 ¶¶ 7–8.

As evidence of Lt. Njoku's malintent, Hendrick states that in July 2024, he discussed the issue of his cell being opened when he was not there with Njoku, who promised to notify the officers and put up a notice not to do so. *Id.* at 5–6 ¶ 11. This was merely pretext, according to Hendrick, because the problem continued. *Id.* For example, in September 2024, he asked Barnett several times to keep his cell closed while he was at breakfast, but Barnett just laughed at him. *Id.* at 6 ¶ 12. On September 12, 2024, he filed a Requests for Administrative Remedy, commonly known as an ARP, to address this issue. ECF 1-2, at 2–3 (noting the ARP was assigned No. JCI-1980-24). The ARP was denied, and Hendrick appealed the denial to the Commissioner of Correction on November 3, 2024. *Id.* at 4–6. His appeal was denied on January 18, 2025. *Id.* at 7. However, Hendrick filed an appeal with the Inmate Grievance Office ("IGO") on January 12, 2025, prior to receiving the Commissioner's response. *Id.* at 8–9. He was directed to show cause why his appeal should not be dismissed for failure to exhaust his administrative remedies, and he filed a response on February 27, 2025. *Id.* at 10–12, 14–16. Hendrick asserts that the Warden claimed that no video evidence existed related to his grievance to coverup the misconduct of the officers. ECF 1-1, at 25–26 ¶ 36. He also claims that there is a practice at JCI where the officers do not wear nametags which interferes with the ability to identify them. *Id.* Hendrick also filed an unsuccessful ARP, No. JCI-0103-25, about this practice. *See* ECF 1-4, at 11–20.

On December 31, 2024, Hendrick had a chronic care visit with Dr. Obsu, where he explained that he had often missed his medication, Acetazolamide 1,000 mg, over the past few weeks because he was unable to walk to medical due to dizziness, a symptom of his idiopathic intracranial hypertension. ECF 1-1, at 6–8 ¶ 13. Hendrick requested that his medication be given "Keep on Person" (KOP) status so he would not miss any doses.[3] *Id.* Dr. Obsu agreed and said he would receive the medication in blister packs to keep in his cell. *Id.* Hendrick did not receive the blister packs nor any medication until February 2025. *Id.* He contends that Obsu lied about placing the order or placed it knowing Hendrik would not receive it. ECF 31, at 8. In one instance during this period, Hendrick became severely dizzy with a bad headache and fell on the tier, hitting his head and mouth. ECF 1-1, at 6–8 ¶ 13. His injuries were treated, but he was bed bound for the following two days until the symptoms subsided. *Id.* Hendrick inquired about his medication with Obsu while he was in the medical department, but Obsu was hostile and defensive. *Id.* Hendrick filed ARP No. JCI-0141-25 on January 21, 2025, complaining about regularly missing his medication despite requesting it be KOP status, which the Warden found meritorious. ECF 1-3, at 2–4.

When Hendrick returned for chronic care on January 22, 2025, and asked again about the KOP medication, Obsu said, "aww come on Hendrick, you and I had a nice time together when you didn't have your meds and fell flat on your face, that was a good time together, you filing these ARP grievances, let's have a good time." ECF 1-1, at 8–9 ¶ 14. Hendrick explained again that he was experiencing dizziness, blurred vision, migraines, and difficulty walking. *Id.* at 9–10 ¶ 15. Obsu again promised that he was ordering the medication to be KOP, but Hendrick never

[3] Hendrick's motion for preliminary injunction was denied as moot after records were submitted showing that he had been prescribed the acetazolamide KOP on February 12, 2026. *See* ECF 69.

received it. *Id.* Hendrick also complains that Obsu told him to take his dose, which consisted of four pills, all at once, but he believes that it is best to take two pills twice a day. *Id.* at 21–22 ¶ 30.

Hendrick saw optometrist Dr. Mezu on February 14, 2025, at which time she agreed that he needed to have the acetazolamide KOP due to his symptoms. *Id.* at 10–11 ¶ 16. Then, however, Mezu asked about his pending ARPs, stating "well, you know that's not a good look." *Id.* She then inquired whether Hendrick was going to write up Dr. Obsu. *Id.* Hendrick did not answer; instead, he asked whether she was going to order his medication KOP. *Id.* Mezu left to go to the pharmacy and confirmed that the blister packs were available but implied that whether she would put in an order for him would depend on how she was feeling. *Id.*

Hendrick claims that Obsu, Mezu, Njoku, Balogun, and Barnett were all aware of his medical condition and that his symptoms were increasingly severe when he did not regularly take the acetazolamide, but that they maliciously refused to help him. *Id.* at 11–13 ¶¶ 17, 19. Hendrick alleges he exhausted the ARP grievance procedure on this claim. *Id.* at 12 ¶ 18.

As to Defendant Washington, Hendrick states that on January 22, 2025, Washington came to his cell to fix the sink, toilet and heat. *Id.* at 13–14 ¶ 20. While he did repair the sink and toilet, he did not fix the heat even though he acknowledged how cold it was in the cell. *Id.* Over the following weeks, Washington said on several occasions he would come back to fix the heat but Hendrick alleges that Washington never did. *Id.* Hendrick filed ARP No. JCI-0058-25 raising the issue, which Washington later said he was investigating despite the complaint being about Washington's own conduct. *Id.* at 14–15 ¶ 21; *see* ECF 1-4, at 2–3. The ARP was dismissed by the Warden who found that the necessary repairs had been completed.[4] ECF 1-4, at 4. Washington

[4] The Warden's denial was of a resubmitted version of the original ARP. The original was dismissed on procedural grounds. ECF 72-2, at 8–9. Hendrick appealed the denial of the resubmitted ARP to the Commissioner and IGO. ECF 1-4, at 5–8. The IGO instructed Hendrick

told Hendrick that inmates do not get anything fixed "when filing against maintenance." ECF 1-1 at 14–15 ¶ 21. Therefore, despite the Warden's findings, Hendrick was without heat until April 2025. *Id.* at 15 ¶ 22. Hendrick alleges that he suffered emotional distress as well as sleepless nights due to the ice-cold temperatures. *Id.* at 15 ¶ 22, at 17–18 ¶ 25. Due to the alleged campaign of retaliation, Hendrick states that he is confined to his cell all day except for the 30 minutes he does his sanitation job on days when he feels well enough. *Id.* at 18–19 ¶ 27. As such, he is unable to attend cognitive group programs, social activities, or recreation. *Id.*

Finally, Hendrick asserts a supervisory liability claim against Warden Stewart in his official capacity. *Id.* at 24 ¶ 34, at 26–27 ¶ 37. On February 19, 2025, at approximately 9:00 a.m., Stewart and a female captain were making rounds, and Hendrick notified Stewart that Washington refused to fix the heat inside his cell. *Id.* at 24–25 ¶ 35. Stewart told him that he should have filed an informal complaint instead of an ARP because it would have been given more attention. *Id.* Hendrick also reported that Njoku, Balogun, and Barnett were entering his cell and stealing his legal papers and personal items while he slept. *Id.* Stewart said he would look into it and take the appropriate action. *Id.* Hendrick contends that he has not done so, because Balogun regularly works on his tier. *Id.* He also claims that Stewart wrongly stated that there was no video footage pertaining to the allegations of theft and retaliation. *Id.* at 25–26 ¶ 36.

Hendrick seeks declaratory judgment, compensatory and punitive damages, and an order requiring JCI officers to wear nametags and undergo property training. ECF 1-1, at 28 – 29 ¶ 37.

---

to refile his appeal and attach paperwork that was missing from his original submission. *Id.* at 9–10. Robin Woolford, IGO Director, attests that Hendrick never submitted the requested paperwork. ECF 72-4, at 1 ¶ 4.

**B. Medical Records**

Hendrick was diagnosed with idiopathic intracranial hypertension ("IIH") on April 30, 2014. ECF 41-4 (Obsu Decl.), at 2 ¶ 5. His neurology team recommended he take 1,000 mg of acetazolamide daily. *Id.* Beginning in January 2024, Hendrick was enrolled in chronic care and seen approximately every three months to manage his condition. *Id.* ¶ 6. On January 30, 2024, Hendrick reported that he had declined to have a "VP shunt" placed when he had a follow-up appointment with his neurology team. ECF 41-3, at 58. At the time, he reported having blurry vision and dull headaches that could be relieved with rest and over-the-counter medications. *Id.* Hendrick had been compliant with his medications, taking it every morning as directed. *Id.* at 60.

Hendrick continued to be seen regularly throughout 2024. On April 15, 2024, Hendrick continued to report headaches and blurry vision but denied dizziness or seizures. ECF 41-3, at 53. After a missed appointment on June 24, 2024, but a follow-up on June 30, his treatment plan remained the same. *See id.* at 46–52. Hendrick saw Dr. Obsu on September 30, 2024, and January 2, 2025; his medication was refilled but no changes were made. *See id.* at 36–45.

On January 9, 2025, RN Juliette Chi evaluated Hendrick after he fell and hit his head while exiting the shower. ECF 41-4, at 2 ¶ 7; ECF 41-3, at 26–27. Dr. Obsu ordered that an ambulance be called to transport Hendrick to an emergency room, but Hendrick refused to go. ECF 41-4, at 2 ¶ 7. At the time, Hendrick was exhibiting slurred speech, lethargy, facial trauma, and memory impairment. *Id.* That day, Hendrick had submitted two sick calls: one complained that due to a fall, he had broken his glasses and another asserted that he had not received his acetazolamide blister packs as Dr. Obsu had promised on December 31, 2024. *Id.* ¶ 8; ECF 41-3, at 71, 74. Dr. Obsu notes that there is no record of an appointment on December 31, 2024. ECF 41-4, at 2 ¶ 8. Hendrick submitted similar sick calls on January 15 and February 2, 2025. *Id.* at 2–3 ¶ 9; ECF 41-

3, at 73, 75. He also complained of dizziness and difficulty walking to the pharmacy. ECF 41-4, at 2–3 ¶ 9. On February 4, 2025, during sick call, Hendrick complained to RN Barbara Peace that he had not received his medication resulting in RN Peace contacting the pharmacy and confirmed that it would be sent that day. *Id.* at 3 ¶ 11; ECF 41-3, at 24. On February 12, 2025, Dr. Obsu issued a special needs order for Hendrick's medication to be administered as "feed-in/keep on person," effective immediately until March 12, 2026. ECF 41-4 at 3 ¶ 12; ECF 41-3, at 23. Two days later, Dr. Mezu ordered Hendrick glasses for his myopic astigmatism. ECF 41-3, at 22.

On January 21, 2025, Hendrick filed an ARP, requesting that his medication be prescribed as KOP so he would not miss a dose. ECF 41-4, at 3 ¶ 10. The Warden found the ARP meritorious on February 21, 2025. *Id.* Regardless, the prescription pharmacist, Correct RX, stated that the medication must be administered as Direct Watch Take ("DOT") because of Hendrick's neurological diagnosis. *Id.* Dr. Obsu attests that he can recommend that a medication be designated KOP, but that he could not override the pharmacy's safety protocols. *Id.* at 4 ¶ 16.

Hendrick submitted a sick call on February 22, 2025, seeking to be excused from work on days he was experiencing dizziness, vision loss, or headaches. ECF 41-4, at 3 ¶ 13; ECF 41-3, at 72. His request was granted by PA Adane Negussie during a provider visit on February 27, 2025. ECF 41-4, at 3 ¶ 13; ECF 41-3, at 19, 67. A medical assignment was issued through February 28, 2026; three copies were provided to Hendrick. ECF 41-4, at 3 ¶ 13; ECF 41-3, at 19, 67. On March 28 and April 4, 2025, Hendrick submitted sick calls complaining that he had not received his prescription glasses; he finally received them on April 10, 2025. ECF 41-3, at 15, 68–69.

Between April and August, 2025, Hendrick was seen for medical appointments on three occasions. ECF 41-4, at 3–4 ¶ 14. Records do not reflect that he raised any complaints, and his medication regimen remained the same. *Id.*; ECF 41-3, at 3–11. Records do reflect that Hendrick

had abnormal potassium levels and was educated on prediabetes. ECF 41-4, at 3–4 ¶ 14; ECF 41-3, at 3–11.

## III. LEGAL STANDARDS

Defendants argue that the amended complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), or, alternatively, that summary judgment should be granted in their favor pursuant to Fed. R. Civ. P. 56. *See* ECF 41-1; ECF 48-1; ECF 72-1. A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Fed. R. Civ. P. 12(d). *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur as the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC 10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

Because Defendants expressly titled and filed their motions as motions to dismiss or, in the alternative, for summary judgment, Hendrick was on notice that the Court could treat the motions as ones for summary judgment and rule on that basis. Accordingly, the Court will review

Hendrick's claims under the Rule 56(a) standard and consider the parties' exhibits where appropriate.

Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255) (second alteration in original). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

The Court is mindful that Hendrick is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean that a court can "ignore an obvious failure to allege facts setting forth a plausible claim for relief." *Sheehan v. Saoud*, 650 F. App'x 143, 152 (4th Cir. 2016) (citing *Weller v. Dep't of*

*Soc. Servs. for City of Baltimore*, 901 F.2d 387, 391 (4th Cir. 1990)). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

### A. Eleventh Amendment and Sovereign Immunity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Accordingly, Washington and the State Defendants are immune from suit for actions taken in their official capacities and those claims must be dismissed. However, the Eleventh Amendment does not bar Hendrick's claims for injunctive or declaratory relief.

### B. Exhaustion of Administrative Remedies

Next, Washington and the State Defendants raise the affirmative defense that Hendrick did not exhaust his administrative remedies before initiating this case. ECF 48-1, at 13; ECF 72-1, at 8. Washington raises this as to all the claims against him, while the State Defendants argue Hendrick failed to exhaust only his Eighth Amendment medical care claim. The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are

available are exhausted." 42 U.S.C. § 1997e(a). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Chase v. Peay*, 286 F. Supp. 2d 523, 527 (D. Md. 2003) (finding that "the exhaustion provision" of the PLRA "plainly extends" to suits regarding prison conditions). Exhaustion under § 1997e(a) is mandatory, and therefore a plaintiff must exhaust his available administrative remedies before a court can hear his claim. *See Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA . . . ."); *Ross v. Blake*, 578 U.S. 632, 638 (2016) (finding that "a court may not excuse a failure to exhaust"). Consequently, if Hendrick has not properly presented his claim through an available administrative remedy procedure, the claim must be dismissed pursuant to the PLRA. *See Ross*, 578 U.S. at 639.

Administrative exhaustion under § 1997e(a) is not, however, a jurisdictional requirement and does not impose a heightened pleading requirement on the detainee. *Jones*, 549 U.S. at 215–16. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See id.*; *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). The Court may dismiss a claim on this ground only if "the defendants raise the issue as an affirmative defense and the inmate has had an opportunity to respond to the affirmative defense" or in "the rare, exceptional instance where administrative exhaustion"—or lack thereof—is "apparent on the complaint's face." *Custis*, 851 F.3d at 362 (citing *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)).

To exhaust his administrative remedies, an inmate must complete "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006); *Moore*, 517 F.3d at 725. This requirement is one of

"proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). A court will not dismiss a claim as unexhausted "if a prisoner, through no fault of his own, was prevented from availing himself of [an administrative remedy]." *Moore*, 517 F.3d at 725.

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any Division of Corrections official or employee. Md. Code Ann., Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established administrative remedy procedure process that applies to all Maryland prisons. Md. Code Regs. ("COMAR") 12.02.28.01. Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official," COMAR 12.02.28.05(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(m) as "the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[5] COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS") for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07–.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1).

Here, as to the claims against Washington, the record shows that while Hendrick submitted an appeal to the IGO, he did not comply with their subsequent instructions to supplement his filing. In his opposition, Hendrick seems to argue that the initial submission of his IGO appeal is sufficient to satisfy the PLRA's exhaustion requirements. ECF 77, at 2. Alternatively, he claims that COMAR 12.07.01.05F excuses him from exhausting the ARP process. *Id.* at 3. The cited

[5] If the Commissioner fails to respond, the grievant shall file their appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

regulation allows for time limitations or procedural bars to be waived for a grievance when the problem is ongoing or for other good cause shown. *See* COMAR 12.07.01.05F. However, this regulation is permissive rather than mandatory. *See id.* Moreover, Hendrick does not claim that he raised this waiver with the IGO. Because Hendrick did not resubmit his IGO appeal with the requisite information, his grievance could not be reviewed on the merits. As such, he failed to properly complete the exhaustion process. Hendrick also argues that the IGO "often assert[s] that they did not receive cop[ies] of ARP[s] and Appeals to the Commissioner of Correction to unduly extend and thwart the ARP process upon filing that were properly filed." ECF 77, at 4. Hendrick does not provide any further information to support this conclusion nor does he claim that this was indeed the case here. There being no basis to find that the grievance process was unavailable to Hendrick, his claims against Washington must be dismissed without prejudice as unexhausted.[6]

As to ARP No. JCI-0141-25, in which Hendrick complains that he was not regularly receiving his medication and seeking to have it moved to KOP status, the Court finds the State Defendants' argument regarding exhaustion unavailing. The State Defendants incorporate by reference the declarations of Kristina Donnelly and Robin Woolford, which were originally submitted with their response to show cause order, filed June 16, 2025. *See* ECF 9. Donnelly and Woolford attest that Hendrick did not file an appeal with either the Commissioner of Correction or the IGO. ECF 9-2, at 1 ¶ 3; ECF 9-3, at 1 ¶ 4. However, these declarations fail to address why, when the ARP was found meritorious by the Warden, Hendrick would have sought further review

[6] While Washington has moved for summary judgment, and the Court has considered evidence attached to the motion in reaching the conclusion herein, the Fourth Circuit has advised that dismissal for failure to exhaust should be without prejudice. *See Moss v. Harwood*, 19 F.4th 614, 623 n.3 (4th Cir. 2021) (collecting cases); *Germain v. Shearin*, 653 F. App'x 231, 234–35 (4th Cir. 2016) (finding dismissal "mandatory" for failure to exhaust and affirming district court's grant of summary judgment but modifying order to be dismissal without prejudice).

of his claims. Hendrick properly brought his complaint to the institution through the ARP process and a decision was made in his favor. As such, the Court finds that the State Defendants have not met their burden to show that Hendrick failed to exhaust his medical care claim.

**C. Failure to State a Claim**

1. First Amendment Retaliation

"The First Amendment protects the right to petition the Government for a redress of grievances, and the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)) (alterations omitted). To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Shaw*, 59 F.4th at 130; *Martin*, 858 F.3d at 249; *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). In assessing a First Amendment claim of retaliation, the question, "from an objective standpoint," is "whether the challenged conduct would 'likely deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023) (quoting *Constantine*, 411 F.3d at 500). Thus, "the challenged conduct" must "generate more than a de minimis inconvenience." *Id.* at 730. Moreover, the Fourth Circuit has stated: "An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Martin v. Duffy*, 977 F.3d 294, 304 (4th Cir. 2020) (cleaned up) (citation omitted).

To establish a causal relationship, the plaintiff first must "show [by direct or circumstantial evidence] that his protected activity was 'a substantial or motivating factor' in the defendants' action." *Shaw*, 59 F.4th at 126 (quoting *Martin*, 977 F.3d at 299). That is, "he must show '(1) that the defendant[s were] aware of [his] engaging in protected activity' and (2) 'some degree of temporal proximity to suggest a causal connection.'" *Id.* at 130–31 (quoting *Constantine*, 411 F.3d at 501). Then, "[t]he burden . . . shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the plaintiff's protected activity." *Id.* at 131. The Fourth Circuit treats prisoners' retaliation claims "with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

Hendrick fails to plead sufficient facts to establish a retaliation claim against Dr. Obsu. Hendrick alleges that he filed ARP No. JCI-0141-25 on January 21, 2025, and the following day he saw Dr. Obsu in chronic care. During that appointment Hendrick alleges that Dr. Obsu made remarks seemingly referencing the filing of the ARP, but Hendrick does not allege that any adverse action was actually taken against him. He claims to have not received his acetazolamide KOP but does not claim that Dr. Obsu failed to place the order for the drug or failed to request that it be received KOP. At most, he speculates that Obsu lied to him or put the order in knowing it would not be filled as requested. The Warden's response finding the ARP meritorious, however, acknowledges that Obsu placed the order as Hendrick wished it to be, with the request that it be "administered as KOP." ECF 1-3, at 4. It was the pharmacy that ultimately required that it be administered DOT due to Hendrick's "neurological condition." *Id.* The ARP response noted that there "is no clear specified documentation of how the medication should be administered," and

thus required the "provider [to] obtain clarification from the . . . pharmacist." *Id.* The ARP response also noted that Hendrick was being considered for "feed-in medication" status which would permit delivery of the medication directly to Hendrick. *Id.* As such, Hendrick's allegations are purely speculative and do not allege any adverse action taken by Dr. Obsu. As such, he cannot sustain a retaliation claim against Dr. Obsu.

Hendrick's claims against the State Defendants fail as well. To the extent he alleges that their actions were motivated by his previous lawsuit, he does not provide any factual allegations in support of this theory. None of the State Defendants were parties in the other action, *Hendrick v. Dean*, Civ. No. BAH-24-1214, and the pleadings are devoid of any possible connection to the defendants in that matter beyond being employed at the same prison. Hendrick also alleges that Defendants' actions, beginning in August 2024, were motivated by grievances filed against them. However, he does not identify any grievances filed before the alleged retaliation began or specify what grievances supposedly prompted the alleged theft and harassment. While filing a grievance or lawsuit is protected First Amendment activity, Hendrick fails to allege any connection between that activity and the alleged misconduct. Accordingly, Hendrick's retaliation claims against the State Defendants must be dismissed.

2. <u>Fourteenth Amendment Equal Protection</u>

Hendrick also claims that Defendants' actions violated his right to equal protection under the law pursuant to the Fourteenth Amendment. The Equal Protection Clause generally requires the government to treat similarly situated people alike. *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his or her equal protection rights were violated, a plaintiff must demonstrate that he or she was treated differently than similarly situated inmates and the discrimination was intentional or purposeful. *See Williams v. Bitner*, 307 Fed. App'x 609, 611 (3d

Cir. 2009) (citing *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)). Neither Hendrick's complaint nor his supplement alleges facts showing that he was treated differently from any other inmate, much less one similarly situated to himself. Without an allegation of differential treatment, Hendrick cannot support a claim under the Equal Protection Clause.

3. Conspiracy

To establish a civil conspiracy under § 1983, Hendrick must establish that Defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive a plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006–07 (4th Cir. 1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagen v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). Here, Hendrick does not allege facts demonstrating that there was any agreement between Defendants to violate his constitutional rights. Hendrick's conclusory allegations of a conspiracy are insufficient to state a plausible claim for relief.

**D. Eighth Amendment Cruel and Unusual Punishment**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501

U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the defendants' actions, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–38 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see, e.g.*, *Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844)).

Dr. Obsu does not address the objective severity of Hendrick's medical need in his motion. Therefore, assuming that Hendrick's IIH diagnosis presents a serious medical need, Dr. Obsu asserts that he is entitled to judgment in his favor because Hendrick fails to demonstrate deliberate indifference under the Eighth Amendment. ECF 41-2. Viewing the evidence in the light most favorable to Hendrick, the Court finds that material facts are in dispute and thus summary judgment is not warranted.

First, however, the Court clarifies that Hendrick's conclusory claim that taking his acetazolamide as two pills twice a day rather than four pills once a day is insufficient to state a claim. In addition to the lack of support for such a claim, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). No exceptional circumstances are present, especially as Hendrick does not allege that he raised this issue with Dr. Obsu or any other provide during his appointments.

As to the distribution of his medication, the record shows that Obsu did submit an order for Hendrick to receive his acetazolamide KOP on February 12, 2025, after Hendrick suffered a

fall in the shower. Obsu points to a sick call Hendrick filed on January 9, 2025, in which he identifies having been dehydrated to establish that Hendrick's IIH was not the cause of his fall. Hendrick, however, avers that due to his fall—and the head injury he sustained because of it—he was disoriented when he filed that sick call. ECF 54-1, at 6–8 ¶ 6. Hendrick alleges that on January 15, 2025, after he had recovered, he amended his request stating that he had hit his head due to not having been provided his medication KOP. *Id.* Therefore, there is dispute on the record as to whether Obsu's alleged inaction as to Hendrick's medication caused Hendrick's fall.

Hendrick attests that during his chronic care appointment on December 31, 2024, prior to his January fall, he requested that Obsu submit an order allowing Hendrick to receive his acetazolamide KOP, but Obsu failed to do so. ECF 54-1, at 10–11 ¶ 10. Hendrick also avers that Obsu was hostile on January 9, 2025, when Hendrick inquired about this issue after the fall, stating "stop speaking to me, if I didn't order it then I didn't order it." *Id.* at 9 ¶ 9. Obsu, for his part, notes in his sworn affidavit that Hendrick's medical records "do not contain any record of an appointment on December 31, 2024." ECF 41-4, at 2 ¶ 9 n.1.

Dr. Obsu also summarily denies having authority to override the pharmacy's safety protocols, which superseded his KOP order. In his motion, and his affidavit, he argues that "[f]inal determinations regarding medication handling are governed by institutional pharmacy policies designed to ensure patient and facility safety, and those determinations are outside the scope of [his] professional control." ECF 41-2, at 14; ECF 41-4, at 4 ¶ 16. However, the declaration does not make clear whether the determinations allegedly beyond Obsu's control that are described in the affidavit fully encompass the precise failures that Hendrick complains of. Thus, a dispute

exists as to whether Obsu failed to ensure that Hendrick received the appropriate medical care.[7] Obsu also claims to be entitled to qualified immunity but in light of the numerous disputes of fact remaining, such a judgment cannot be made at this time. *See Miles v. Bollinger*, 979 F.2d 848 (4th Cir. 1992) (noting that ruling on qualified immunity is inappropriate where the defense "turns on an interpretation of facts which are in dispute"). Obsu's motion will be denied as it relates to the Eighth Amendment claim.

The State Defendants also respond Hendrick's allegations regarding medical care, however, the Court will not address them as Hendrick attests that he did not seek to bring such a claim against them. ECF 54-1, at 4 ¶ 3. However, the complaint does allege that the State Defendants' alleged misconduct subjected Hendrick to cruel and unusual punishment in violation of the Eighth Amendment. The Court construes this as a challenge to the unsafe conditions Hendrick states he was held in as a result of the various forms of harassment alleged. The State Defendants have not responded to this claim under the Eighth Amendment and thus it survives.

## V. CONCLUSION

For the foregoing reasons, Defendant Washington's motion will be granted and the claims against him dismissed without prejudice; the State Defendants' motion will be granted except as to the Eighth Amendment conditions claim; and Dr. Obsu's motion will be granted except as to the Eighth Amendment medical care claims. Damages claims against the State Defendants in their official capacities are dismissed. The complaint is also dismissed as to Hendrick's retaliation, equal protection, and conspiracy claims. Defendant Obsu and the State Defendants shall answer

[7] The Court notes that the record shows that Hendrick did not ultimately receive his acetazolamide KOP until questions were raised by the Court in relation to Hendrick's motion for preliminary injunction, a year after Obsu first issued the order.

the remaining claims within 30 days. Because this case will proceed to discovery, Hendrick's motion to appoint counsel (ECF 53) will be granted.

A separate Order follows.

September 16, 2026 ______________/s/_________________
Date Brendan A. Hurson
United States District Judge